LAURA B. POWELL (CA Bar 240853)
2120 Contra Costa Blvd. #1046
Pleasant Hill, CA 94523
Telephone: (510) 457-1042
laura@laurabpowell.com
*Local Counsel*

GREGORY DOLIN (*pro hac vice* forthcoming)
JENIN YOUNES* (*pro hac vice* pending)
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
jenin.younes@ncla.legal
*Designated Counsel for Service

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TRACY HØEG, M.D., Ph.D.,**<br>**RAM DURISETI, M.D., Ph.D.,**<br>**AARON KHERIATY, M.D.,**<br>**PETE MAZOLEWSKI, M.D.,**<br>and<br>**AZADEH KHATIBI, M.D., M.S., M.P.H.**<br>     *Plaintiffs*,<br><br>    v.<br><br>**GAVIN NEWSOM**, Governor of the State<br>of California, in his official capacity;<br>**KRISTINA LAWSON**, President of the<br>Medical Board of California,<br>in her official capacity;<br>**RANDY HAWKINS, M.D.,** Vice President<br>of the Medical Board of California,<br>in his official capacity;<br>**LAURIE ROSE LUBIANO**, Secretary<br>of the Medical Board of California,<br>in her official capacity;<br>**MICHELLE ANNE BHOLAT, M.D.,**<br>**M.P.H., DAVID E. RYU, RYAN BROOKS,**<br>**JAMES M. HEALZER, M.D.,**<br>**ASIF MAHMOOD, M.D.,**<br>**NICOLE A. JEONG,**<br>**RICHARD E. THORP, M.D., VELING**<br>**TSAI, M.D.,** and **ESERICK WATKINS,**<br>members of | Case No. _____<br><br>**COMPLAINT**<br>**FOR DECLARATORY AND**<br>**INJUNCTIVE RELIEF**<br><br><br>JURY TRIAL DEMANDED |

the Medical Board of California,       )
in their official capacities;          )
and **ROB BONTA**, Attorney General of )
California, in his official capacity,  )
                                       )
                *Defendants*.          )

## INTRODUCTORY STATEMENT

Assembly Bill (AB) 2098, signed into law on September 30, 2022, and effective January 1, 2023, empowers the Medical Board of California and the Osteopathic Medical Board of California ("the Board") to discipline physicians who "disseminate" information regarding Covid-19 that departs from the "contemporary scientific consensus." Plaintiffs are five physicians, licensed by the Board, who treat patients on a regular basis. They allege violations of their First Amendment rights to free speech and expression, and their Fourteenth Amendment rights to due process of law.

First, the law imposes a quintessential viewpoint-based restriction, because it burdens speech determined by the Board to diverge from the "contemporary scientific consensus." In safeguarding Americans' rights to free speech and expression, the First Amendment applies not only to expression of majority opinions, but to minority views as well. Indeed, it is minority views that need protection from government censorship—as this law shows. Nor is there an exception to the prohibition on viewpoint-based discrimination simply because the law applies only to a regulated profession. In short, AB 2098 infringes Plaintiffs' First Amendment rights because it impedes their ability to communicate with their patients in the course of treatment.

Second, the term "contemporary scientific consensus" is undefined in the law and undefinable as a matter of logic. No one can know, at any given time, the "consensus" of doctors and scientists on various matters related to prevention and treatment of Covid-19. And even if such a poll could theoretically be taken, who would qualify to be polled? Only those doctors treating Covid-19 patients? All doctors and scientists, or only those in certain fields? Who determines

which fields?  How often would such polls be taken to ensure the results are based on the most up-to-date science?  How large a majority (or plurality) of the polled professionals qualifies as a "consensus"?  The very existence of these questions illustrates that any attempt at a legal definition of "scientific consensus" according to which doctors must operate in their day-to-day practice is impractical and borders on the absurd.  As Plaintiffs attest, they cannot possibly know what the "scientific consensus" is at any given moment, making them fearful of being honest with patients when recommending the best course of action, taking into account their patients' individual circumstances. Put succinctly and in legal terms, AB 2098 is unconstitutionally vague and thereby creates a severe chilling effect, in violation of Plaintiffs' rights to due process of law.

Rarely does a state legislature pass a bill that is so obviously unconstitutional.  Even more rarely does a governor sign that bill into law.  For the reasons put forth below, Plaintiffs ask the Court to declare AB 2098 unconstitutional and halt its enforcement before it goes into effect.

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and 42 U.S.C. § 1983, because the federal law claims arise under the Constitution and statutes of the United States.

2.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Plaintiff Tracy Høeg resides and practices medicine in it, and Defendants are sued in their official capacities and therefore their residences for the purpose of determining venue are within this district, where they perform their official duties.

3.      This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**PARTIES**

4.    Plaintiff Tracy Høeg, M.D., Ph.D., is a resident of California and is currently licensed as a physician and surgeon by the Board.

5.    Plaintiff Ram Duriseti, M.D., Ph.D., is a resident of California and is currently licensed as a physician and surgeon by the Board.

6.    Plaintiff Aaron Kheriaty, M.D. is a resident of California and is currently licensed as a physician and surgeon by the Board.

7.    Plaintiff Pete Mazolewski, M.D. is a resident of California and is currently licensed as a physician and surgeon by the Board.

8.    Plaintiff Azadeh Khatibi, M.D., M.S., M.P.H., is a resident of California and is currently licensed as a physician and surgeon by the Board.

9.    Defendant Gavin Newsom is the Governor of California, charged with ensuring that the laws of the state are executed.  He is sued in his official capacity, and his official address is 1021 O Street, Suite 9000, Sacramento, CA 95814.

10.    Defendant Kristina Lawson is President of the Board; Defendant Randy W. Hawkins, M.D., is Vice President of the Board; Defendant Laurie Rose Lubiano is Secretary of the Board; and Defendants Michelle Anne Bholat, M.D., M.P.H., David E. Ryu, Ryan Brooks, James M. Healzer, M.D., Asif Mahmood, M.D., Nicole A. Jeong, Richard E. Thorp, M.D., Veling Tsai, M.D., and Eserick Watkins are Members of the Board. The members of the Board are charged with implementing AB 2098.  Board members are sued in their official capacities, and their official address is 2005 Evergreen Street, Suite 1200, Sacramento, CA 95815.

11.    Defendant Rob Bonta is the Attorney General of California, charged with enforcing the laws of the state.  He is sued in his official capacity, and his official address is 1300 I Street, Suite 125, Sacramento, CA 95814.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**STATEMENT OF FACTS**

I.   **THE REGULATION OF PHYSICIANS IN CALIFORNIA**

12.   The Board is tasked with issuing medical licenses and certificates in the State of California, hearing disciplinary actions against licensees, and suspending, revoking, or otherwise limiting certificates, among other responsibilities. Cal. Bus. & Prof. Code §§ 2004 & 2220.5.

13.   California Business and Professions Code section 2001.1 establishes that the "highest priority" of the Board must be the protection of the public and that "[w]henever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount."

14.   The Board's members are appointed by the Governor and state lawmakers. Cal. Bus. & Prof. Code § 2001(b). Seven of the Board's 15 members are designated as "public members" who may not be licensed physicians. Cal. Bus. & Prof. Code §§ 2001(a) & 2007.

15.   California Business and Professions Code section 2234 requires the Board to discipline doctors who engage in "unprofessional conduct." The statute enumerates seven grounds, which include a single act of gross negligence, repeated acts of negligence, and incompetence. Other sections provide additional, specific standards for unprofessional conduct. Cal. Bus. & Prof. Code §§ 2236, et seq.

16.   However, California Business and Professions Code section 2234.1 provides that a doctor may not be subject to discipline pursuant to section 2234 "solely on the basis that the treatment or advice he or she rendered to a patient is alternative or complementary medicine," subject to several conditions. "Alternative or complementary medicine" is defined as "those health care methods of diagnosis, treatment, or healing that are not generally used but that provide a reasonable potential for therapeutic gain in a patient's medical condition that is not outweighed by the risk of the health care method."

17.     Subdivision (c) of California Business and Professions Code section 2234.1 states: "Since the National Institute of Medicine has reported that it can take up to 17 years for a new best practice to reach the average physician and surgeon, it is prudent to give attention to new developments not only in general medical care but in the actual treatment of specific diseases, particularly those that are not yet broadly recognized in California."

18.     AB 2098, signed into law on September 30, 2022, adds section 2270 to the California Business and Professions Code effective January 1, 2023. Assem. Bill 2098, 2021-2022 Reg. Sess., ch. 938, 2022 Cal. Stat.

19.     AB 2098 creates a new provision defining "unprofessional conduct," aimed exclusively at the "dissemination of misinformation or disinformation related to the SARS-CoV-2 coronavirus, or 'COVID-19.'"

20.     Section 1 lays out the ostensible justification for the bill, which is the death toll of Covid-19; that CDC data shows that unvaccinated individuals are at significantly higher risk of dying; that the spread of "misinformation" and "disinformation" about COVID-19 vaccines has weakened public confidence and placed lives at serious risk; and that "major news outlets" have reported that health care professionals are "some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines."

21.     Under this new statute, "[i]t shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines."

22.     "Misinformation" is defined as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."

23.     The Act neither defines nor provides guidance for determining the meaning of

"contemporary scientific consensus."

24.     "Disinformation" is defined as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead."

25.     "Disseminate" is defined as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice."

26.     AB 2098's sponsor, the California Medical Association, argued that this law is needed because of physicians who "call[] into question public health efforts such as masking and vaccinations." Assem. Com. on Business & Professions, Analysis of Assem. Bill No. 2098 (2021-2022 Reg. Sess.), as introduced Feb. 14, 2022, p. 10.  Likewise, the bill analysis from the Senate Committee refers to the problem of "misinformation about the safety and effectiveness of the COVID-19 vaccine and the use of masks for prevention." Sen. Com. on Business, Professions & Economic Development, Analysis of Assem. Bill No. 2098 (2021-2022 Reg. Sess.), as amended Jun. 21, 2022, p. 4.

27.     Governor Newsom attached a statement to his signature on the bill narrowing application to "those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care while interacting directly with a patient under their care."

28.     This commentary in the form of a signing statement has no legal effect under California law, so the law will be applied and interpreted as it is written, and not as Governor Newsom's commentary would seek to constrain or narrow its application.

29.     AB 2098 is scheduled to take effect January 1, 2023.

30.     Physicians who are negligent and commit malpractice (for example, a doctor who advises a patient to inject himself with bleach to treat Covid-19) are already subject to tort lawsuits and disciplinary actions by the Medical Board under existing state law.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

31.     For example, the Board is empowered to investigate, and if necessary, take enforcement action against "any physician and surgeon where there have been any judgments, settlements, or arbitration awards requiring the physician and surgeon or his or her professional liability insurer to pay an amount in damages in excess of a cumulative total of thirty thousand dollars."  Cal. Bus. & Prof. Code § 2220(b).

## II.     THE PLAINTIFFS

### A.     Tracy Høeg, M.D.

32.     Dr. Tracy Høeg is currently licensed as a physician and surgeon by the Board.  She is also licensed to practice medicine in Denmark.  10/31/22 Declaration of Dr. Tracy Høeg, attached as Exhibit A ¶¶ 2-3.

33.     Dr. Høeg received a medical degree from the University of Wisconsin-Madison and a Ph.D. in epidemiology and public health from the University of Copenhagen in Denmark.  Exhibit A ¶ 2.

34.     Currently, Dr. Høeg practices physical medicine and rehabilitation in Nevada County and Sacramento County in California.  She also works as a clinical health and policy researcher and independent consultant epidemiologist.  Exhibit A ¶ 3.

35.     Dr. Høeg has been the first or senior author of nine epidemiological analyses, six of which have been published in peer-reviewed journals, and three of which are currently in pre-print. The topics of these studies have included, inter alia, Covid-19 transmission in schools, effectiveness of mask mandates, and risk-benefit analyses of Covid-19 mRNA vaccines in both children and adults. Exhibit A ¶ 8.

### B.     Ram Duriseti, M.D.

36.     Dr. Ram Duriseti, who earned a medical degree from the University of Michigan and a Ph.D. in Engineering with an emphasis on computation modeling of complex medical

decisions, is currently an Emergency Room physician at the Stanford Department of Emergency Medicine and Mills-Peninsula hospital in Burlingame. 10/20/22 Declaration of Dr. Ram Duriseti, attached as Exhibit B ¶¶ 2-3.

37.     Since at least March 2020, Dr. Duriseti has treated hundreds of Covid-19 patients. In this time period, he has read and analyzed hundreds of journal articles on Covid-19 and related topics, and co-authored academic analyses of Covid-19 mitigation policies and their impacts. Exhibit B    ¶ 5.

38.     As part of his Covid-related academic work, Dr. Duriseti has published a paper on disparities in access during Covid-19 and formal methodological comments on Covid-related journal articles. He has a manuscript in progress re-analyzing a mask randomized controlled trial using random effects and employing the Monte Carlo method, and has another manuscript in progress with an econometrics team at Ljubljana University in Slovenia. He is also working with a local public health department to design and implement a statistical analysis software application for the processing of their Covid-19 data and is planning to publish the results. Exhibit B ¶ 4.

39.     Dr. Duriseti has recently become involved in public advocacy relating to Covid-19 policy by publishing opinion pieces, testifying as an expert witness before the state Senate Health Committee, and holding one-on-one meetings with state Senators and their staffs regarding Covid policy. Exhibit B ¶ 4.

40.     Dr. Duriseti volunteers with an organization called the Urgency of Normal, a group of physicians, researchers, and children's advocates who are working to get children's lives back to normal after the pandemic. Because of his professional background, Dr. Duriseti assists Urgency of Normal by analyzing data. Exhibit B ¶ 4.

C.     *Aaron Kheriaty, M.D.*

41.     Dr. Aaron Kheriaty has a medical degree from Georgetown University and

completed his residency in psychiatry at the University of California Irvine.  He served as Professor of Psychiatry and Director of the Medical Ethics Program at U.C. Irvine for many years.  Now, in addition to holding a number of posts and fellowships related to his expertise in medical ethics, Dr. Kheriaty is the Chief of Psychiatry and Ethics at Doc1 Health and Chief of Medical Ethics at the Unity Project.  10/18/22 Declaration of Dr. Aaron Kheriaty, attached as Exhibit C ¶ 3.

42.     He has written extensively on the subjects of bioethics, social science, psychiatry, religion, and culture, published in a range of national newspapers; and he has also been interviewed numerous times on his areas of expertise on radio and television.  Exhibit C ¶ 3.

43.     Dr. Kheriaty co-authored the University of California's pandemic ventilator triage guidelines for the U.C. Office of the President.  He consulted for the California Department of Public Health on the state's triage plan for allocating scarce medical resources. Exhibit C ¶ 4.

44.     In early 2021, Dr. Kheriaty helped develop the vaccine-allocation policy at the University of California when demand for vaccines outpaced the supply. Exhibit C ¶ 4.

45.     He also served as a psychiatric consultant at the U.C. Irvine hospital. Exhibit C ¶ 2.

D.     *Pete Mazolewski, M.D.*

46.     Dr. Pete Mazolewski has an M.D. from the University of Southern California. 10/21/22 Declaration of Dr. Pete Mazolewski, attached as Exhibit D ¶ 2.

47.     He has worked as a private practice physician for over 20 years, and currently works as a general and trauma surgeon for John Muir Health, handling the highest volume of acute and general trauma surgeries while never having had a single lawsuit filed against him.  Exhibit D ¶ 5.

48.     Dr. Mazolewski has published extensively in his area of expertise. Exhibit D ¶ 6.

E.     *Azadeh Khatibi, M.D.*

49.     Azadeh Khatibi holds an M.D. from the University of California, San Francisco, and Master's Degrees in Public Health (MPH) and Health and Medical Sciences, both from the

University of California, Berkeley. Exhibit E ¶ 3.

50.     In her practice, she has cared for numerous patients with infectious diseases and published scholarly articles in peer-reviewed journals.  Exhibit E ¶¶ 4-5.

51.     Dr. Khatibi is also a patient.  She had a serious, life-threatening disease and was given a 75% chance of dying within five years.  As a result of this disease and its treatment, she has ongoing immune system issues.  Exhibit E ¶ 6.

**III.     ETHICAL CONSIDERATIONS**

52.     On information and belief, AB 2098 interferes with the ability of doctors and their patients to freely communicate.

53.     As Dr. Kheriaty explains, patients want to know that if they ask their physician a question, including a question about Covid-19, they will get the doctor's honest opinion.  Patients will be unable to trust physicians if they believe their doctors are simply parroting a government-approved "consensus" answer without regard to whether or not their doctor actually endorses it. Exhibit C ¶¶ 5-6.

54.     Dr. Høeg likewise affirms that "one of the reasons my patients place deep faith in me is that I am fully honest and transparent about their diagnosis, prognosis and potential treatment and I take the time to thoroughly review the relevant scientific literature."  Exhibit A ¶ 10.

55.     As a result of their training and experience as scientists and physicians, Plaintiffs strongly believe that the very concept of "scientific consensus" is problematic and represents a misunderstanding of the scientific process.  What is considered the consensus one day may later turn out to be the incorrect approach.

56.     For example, at the beginning of the pandemic, the standard of care for treatment of patients with severe Covid-19 was intubation.  Dr. Duriseti resisted invasive intubation while the consensus was evolving—then the consensus changed and his view became the prevailing one.

Exhibit B ¶ 8.

57.    Using the same example, Dr. Kheriaty observes that "[y]esterday's minority opinion often becomes today's standard of care."  Exhibit C ¶ 10.

58.    In that vein, Dr. Høeg explains that:

> [A]s the virus mutates and population immunity increases, we have seen vaccine effectiveness decrease in a way that has been difficult to predict and continues to rapidly change. We have also gained knowledge about the likelihood of severe adverse reactions to the COVID-19 vaccines, as well as long-term implications of post-vaccination myocarditis. This new information has changed and continues to change the risk-benefit calculations for each age, sex, and underlying health status demographic and for each dose of vaccination. A generic statement such as "the COVID-19 vaccine works" simply does not account for the complexity of the risk-benefit calculus. Such a statement is the opposite of individualized medicine. Indeed, we physicians have a duty to give accurate information to our patients yet, under AB-2098, we may not have the freedom to do so.

Exhibit A ¶¶ 26-27.

59.    Dr. Høeg adds:

> Because my primary duty is and will always remain the well-being of my patients, I will most certainly continue to tell them the truth about their conditions and treatments to the best of my ability. Nevertheless, since the passage of AB 2098 I have found myself in a difficult position. I am afraid of saying something to my patients that I know is consistent with the current scientific literature but may not yet be accepted by the California Medical Board. Physicians must feel free to speak truthfully with their patients if they wish to gain and maintain their trust.

Exhibit A ¶ 30.

60.    Dr. Duriseti also explains that, while there is no doubt that the Covid vaccines have saved lives in immune-naïve individuals at risk of severe disease, the conversation around the Covid vaccines has been toxic and destructive.  Through June 2021, the official position of the CDC, White House Covid task force spokespeople, and leadership at the National Institutes of Health/National Institute of Allergy and Infectious Diseases (NIH/NIAID) was that individuals

vaccinated against Covid were not capable of spreading the virus and that myocarditis was not a known complication of Covid mRNA vaccines.  Exhibit B ¶ 14.

61.     Yet there was never any trial data obtained by the manufacturers of the mRNA vaccines to support the claim that they prevented transmission—and indeed, the real-world evidence is now clear that they do not.  Exhibit B ¶ 15.

62.     With respect to myocarditis, the CDC position directly contradicted the data coming in from Israel during the first half of 2021 indicating that, for certain demographics—namely young men—the risk of vaccination (due to myocarditis) might outweigh the risk of Covid.  Exhibit B ¶ 14.

63.     As Dr. Kheriaty explains, "[a]dvances in science and medicine typically occur when doctors and scientists challenge conventional thinking or settled opinion.  Fixating any current medical consensus as 'unassailable' by physicians will stifle medical and scientific progress."  Exhibit C    ¶ 9.

64.     He continues: "Good science is characterized by conjecture and refutation, lively deliberation, often fierce debate, and always openness to new data.  The censorship of free inquiry and free speech in AB 2098 spells not only the demise of civil liberties and constitutional rights for physicians in CA, but the end of the scientific enterprise when it comes to dealing with Covid in my home state."  Exhibit C ¶ 11.

65.     In the 1990s, Dr. Mazolewski was taught that every appendicitis should be operated on as quickly as possible.  But around 2000, it became clear to him, based on his professional clinical experience, that immediate appendectomy should not be the standard treatment for all patients diagnosed with appendicitis, as those with complicated situations have far too high a complication rate following surgery.  Exhibit D ¶ 9.

66.     Dr. Mazolewski found that practicing in accordance with his discovery was not easy,

as there was enormous professional peer pressure to follow the "consensus."  But he did not waver, because he knew it was in his patients' best interests.  Today, his approach is standard practice. Exhibit D ¶ 10.

67.     In his own words, "science is always evolving and starts with the clinician who recognizes an improvement over the standard of care and implements that into his or her practice. This new approach then undergoes scrutiny with rigorous clinical trials which can take years to complete, and by virtue, the 'contemporary scientific consensus' lags behind what is being observed by the physician treating patients every day."  Exhibit D ¶ 12.

68.     For this reason, physicians on the cutting edge always will be in the minority.

69.     Dr. Khatibi agrees.  "[C]onsensus—whether formal or informal—is always catching up to the latest emerging evidence or thought frameworks, and thus is always behind … . AB 2098 does not define 'consensus,' nor does it account for the fact that consensus lags behind the latest emerging evidence or thought framework."  Exhibit E ¶ 11.

70.     Furthermore, she observes, "[t]he process of creating formal consensus guidelines for publication involves disagreement between doctors" which can "shed light on areas of controversy and launch further discussion." Exhibit E ¶ 9.

71.     "In free societies throughout modern history, doctors have had the liberty to go against both informal and formal consensus in treating their individual patients, whose cases may not be suitable for conforming to general guidelines or align with methods and outcomes of particular studies," Dr. Khatibi concludes.  Exhibit E ¶ 10.

72.     An apparent consensus does not necessarily mean an actual consensus. Professionals who dissented from health officials on various matters related to Covid (and in other medical contexts as well) have been silenced socially as well as by mainstream and social media, while those who tend to promote government-approved policies are amplified by the same sources.

*See* Exhibit B ¶ 9; *see also* Exhibit A ¶¶ 31-32.

73.     Plaintiffs above attest that they cannot communicate freely with patients, nor treat them properly, according to their best judgment, when they fear being reported and potentially subject to discipline for giving a patient advice that departs from a supposed "scientific consensus."

74.     Plaintiffs are put between a rock and a hard place, fearing repercussions for acting in their patients' best interests by giving them the information Plaintiffs believe their patients need.

75.     Indeed, use of AB 2098 as a weapon to punish doctors who dissent from the apparent mainstream is not merely speculative.  It appears to be the point of the law.

76.     Plaintiffs Høeg, Duriseti, Kheriaty, Mazolewski, Khatibi and other doctors, have directly experienced threats from other doctors in response to their exercise of their free speech rights on social media, sometimes with direct references to AB 2098.

77.     These threats have emanated with particular ferocity from numerous individuals, and in particular from people associated with a nonprofit organization called No License for Disinformation (NLFD). NLFD was one of the primary proponents of AB 2098.  Its executive director was twice invited by the bill's author to testify as one of two lead witnesses in support of the bill during its legislative hearings.  NLFD frequently uses Twitter to encourage others to report any licensing physicians to their medical boards for making any statements it claims are inaccurate.

78.     For example, Dr. Chris Hickie, an Arizona physician who is also associated with NLFD,  on January 1, 2022 tweeted a screenshot of a portion of a study by Plaintiff Dr. Høeg that contained the phrase: "the risk of myocarditis following vaccination is consistently higher in young males," and remarking on August 9, 2022 "You deserve to lose your medical license, Hoeg," and "I look forward to reporting you to your medical board once a certain law is passed in California." See Exhibit F.

79.     On August 10, 2022, Dr. Hickie tagged Dr. Høeg along with another doctor in a

tweet that read, "Since you are also in California, Mantz, I can report you now alongside quack Hoeg for spreading medical disinformation once that law passes in California."  See Exhibit G.

80.     In response to a tweet from Dr. Høeg sharing an op-ed she published advocating against AB 2098, on June 29, 2022, Dr. Nichols tweeted, "Why so defensive, Tracy?  Scared?"  See Exhibit H.

81.     Dr. Hickie responded to a September 29, 2022 tweet from Dr. Kheriaty asserting that the Covid mass vaccination campaign was reckless with "Can't wait to see you lose your license."  See Exhibit I.

82.     Dr. Khatibi received a threat from an individual, who stated:  was threatened by someone on social media, who stated, "I will take great pleasure in seeing #AB2098 become law and seeing your license to practice medicine in California gone!"  See Exhibit J.

83.     Not only does Dr. Khatibi consider AB 2098 problematic from the perspective of a physician.  She suffered from a serious, life-threatening illness, and was given a 75% chance of dying within five years of diagnosis.

84.     After consulting with numerous doctors, Dr. Khatibi decided to adopt the approach of one—whose views bucked consensus that she should opt for a less aggressive treatment.

85.     Not only did she survive, but her "results were remarkable, to the surprise and delight of all the doctors.  Other doctors were eager to find out [her] protocol when they realized I was doing so well."  Exhibit E ¶ 16.

86.     She continues: "If the lone doctor had been afraid of getting investigated or having his license revoked for suggesting a non-consensus opinion, I wouldn't have heard about options for aggressive treatment.  Had my doctor's speech been chilled to only advise and offer consensus treatments, I might not be alive today.  Moreover, the medical advancements that come from noticing my excellent results and then applying it to others would have never happened."  Exhibit

E ¶ 17.

## CONSTITUTIONAL PRINCIPLES

### I.   THE FIRST AMENDMENT RIGHT TO FREE SPEECH

87.    The First Amendment, incorporated against the States through the Fourteenth Amendment, prohibits Government from making laws that punish people for expressing certain viewpoints.  See Ashcroft v. ACLU, 535 U.S. 564, 572 (2002) ("The First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").

88.    "The First Amendment gives freedom of mind the same security as freedom of conscience … .  And the rights of free speech and free press are not confined to any field of human interest."  Thomas v. Collins, 323 U.S. 516, 531 (1945).

89.    "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein."  W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).

90.    "[A]s a general matter, … government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002).

91.    The government may not discriminate against speech based on the ideas or opinions it conveys.  See Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829-30 (1995) (explaining that viewpoint discrimination is an "egregious form of content discrimination" and "presumptively unconstitutional.").

92.    "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."

Pennsylvania Freethought Soc'y v. Lackawanna Transit Sys., 938 F.3d 424, 432 (3d Cir. 2019) (quoting Rosenberger, 515 U.S. at 829).

93.     The essence of viewpoint discrimination is when the law "reflects the [g]overnment's disapproval of a subset of messages it finds offensive."  Matal v. Tam, 137 S. Ct. 1744, 1763 (2017).

94.     Government action that chills speech by punishing those who express certain views violates the First Amendment.  Citizens United v. Federal Election Com'n, 558 U.S. 310, 329 (2010) (political speech "is central to the meaning and purpose of the First Amendment.").  See Virginia v. Black, 538 U.S. 343, 365 (2003) (holding that provision prohibiting flag-burning "chills constitutionally protected political speech … [which is] at the core of what the First Amendment is designed to protect."); Penny Saver Publications, Inc. v. Vill. of Hazel Crest, 905 F.2d 150, 154 (7th Cir. 1990) ("Constitutional violations may arise from the chilling effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.").

95.     The First Amendment also protects the right to receive information.  See Martin v. E.P.A., 271 F.Supp.2d 38 (2002) (quoting Va. State Board of Pharm. v. Va. Citizens Consumer Council, 425 U.S. 748, 756 (1976) ("Where a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both.")).

96.     The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly guaranteed by the Constitution" because "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them."  Board of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico, 457 U.S. 853, 867 (1982).  See also id. ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them.  It would be a barren marketplace of ideas that had only sellers and no buyers.") (quoting Lamont v. Postmaster General, 381 U.S. 301, 308 (1965) (Brennan, J.,

concurring)).

97.     As the Supreme Court has recognized, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more."  Packingham v. North Carolina, 127 S. Ct. 1730, 1735 (2017).

98.     Labeling speech "misinformation" does not strip it of First Amendment protection. While the right to free speech is not absolute, there is no general exception to the First Amendment that applies to false statements.

99.     "Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements.  This comports with the understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee."  United States v. Alvarez, 567 U.S. 709, 718 (2012) (plurality op.).

100.    Indeed, yesterday's "misinformation" often becomes today's viable theory and tomorrow's established fact.  "Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal.  Today's accepted wisdom sometimes turns out to be mistaken."  Id. at 752 (Alito, J., dissenting).

101.    "Permitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile a list of subjects about which false statements are punishable.  That governmental power has no clear limiting principle.  Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."  Id. at 723 (citing George Orwell, Nineteen Eighty-Four (1949) (Centennial ed. 2003)).

102.   In a similar vein, the First Amendment protects minority perspectives.  See Board of Regents of University of Wisconsin System v. Southworth, 529 U.S. 217, 235 (2000) ("The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views.").

103.   Furthermore, "a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights."   Greenberg v. Goodrich, No. 20-03822, 2022 WL 874953, at *27 (E.D. Pa. 2022) (quoting NAACP v. Button, 371 U.S. 415, 439 (1963)).

104.   Indeed, despite earlier efforts from the California Legislature, the Supreme Court explicitly refuses to recognize "'professional speech' as a separate category … .  Speech is not unprotected merely because it is uttered by 'professionals.'"  National Institute of Family and Live Advocates v. Becerra, 138 S. Ct. 2361 (2018) (invalidating California law requiring pregnancy-related clinics to provide a government-drafted script about the availability of state-sponsored services, including abortion).

105.   Likewise, the Ninth Circuit has held that, "professional speech may be entitled to 'the strongest protection our Constitution has to offer.'"  Conant v. Walters, 309 F.3d 629, 637 (9th Cir. 2002) (quoting Florida Bar v. Went for It, Inc., 515 U.S. 618, 634 (1995)).

106.   The Ninth Circuit has "recognized the core First Amendment values of the doctor-patient relationship," Conant, 309 F.3d at 637, and guided by First Amendment principles prohibiting viewpoint discrimination has enjoined policies that "threatened to punish physicians for communicating with their patients about the medical use of marijuana." id. at 633.

107.   Upholding the district court's grant of an injunction in Conant, the Ninth Circuit held that "[p]hysicians must be able to speak frankly and openly to patients.  That need has been recognized by the courts through the application of the common law doctor-patient privilege."  Id. at 636 (citing Fed. R. Evid. 501).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## II.    DUE PROCESS OF LAW AND VOID-FOR-VAGUENESS DOCTRINE

108.    Due process of law requires that legal prohibitions are clearly defined.  See Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

109.    "Rudimentary justice requires that those subject to the law must have the means of knowing what it prescribes.  It is said that one of emperor Nero's nasty practices was to post his edicts high on the columns so that they would be harder to read and easier to transgress."  Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1179 (1989).

110.    Vague laws may trap the innocent by failing to provide fair warning, and lead to arbitrary and discriminatory enforcement, resulting in delegations of basic policy to police, judges, and juries.  Grayned, 408 U.S. at 109.

111.    A law is vague if it "does not give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  Id. at 108-09.

112.    Vague statutes are of particular concern in the First Amendment context because they "operate to inhibit the exercise of" First Amendment rights. Id. (citing Cramp v. Board of Public Instruction of Orange County, Florida, 368 U.S. 278, 287 (1961)).  See also Gammoh v. City of La Habra, 395 F.3d 1114, 1119 (9th Cir. 2005) ("A greater degree of specificity and clarity is required when First Amendment rights are at stake.").

113.    Where a statute "clearly implicates free speech rights," a facial vagueness challenge is appropriate.  Cal. Teachers Ass'n v. State Bd. of Educ., 271 F.3d 1141, 1150 (9th Cir. 2001).

114.    It is sufficient that the challenged statute regulates and potentially chills speech which, in the absence of any regulation, receives some First Amendment protection.  Id.

115.    In the vagueness inquiry, the requirement that laws be precise is aimed at preventing "chill"; rather than risk sanctions, citizens will steer far wider than necessary to avoid engaging in prohibited speech.  Hunt v. City of Los Angeles, 601 F.Supp.2d 1158 (C.D. Cal. 2009).

116.    "Even when speech is not at issue, the void-for-vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; and second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.   When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  FCC v. Fox TV Stations, Inc., 567 U.S. 239, 253-254 (2012).

117.    An individual possesses a constitutionally protected interest in a license, once issued.  See Sabow v. United States, 93 F.3d 1445, 1456 (9th Cir. 1996), as amended (Sept. 26, 1996) (recognizing that a medical license is "a constitutionally protected property interest.") (citing Schware v. Bd. of Bar Exam. of N.M., 353 U.S. 232, 238-39 (1957)).

## CLAIMS FOR RELIEF

### COUNT I:  FIRST AMENDMENT VIOLATION (VIEWPOINT DISCRIMINATION)

118.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

119.    AB 2098 constitutes a quintessential, unlawful content and viewpoint-based restriction on speech in violation of Plaintiffs' First Amendment rights, because it subjects them to discipline for "dissemination of misinformation or disinformation related to COVID-19."   See Iancu v. Brunetti, 139 S.Ct. 2294, 2299 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys.").

120.    "Misinformation" is defined as that which departs from scientific consensus.

121.    Thus, AB 2098 punishes physicians who express certain views to patients in the course of treating them—those deemed to fall outside the "scientific consensus"—by those with the power to define that phrase.

122.   Minority views are entitled to no lesser constitutional protection than majority opinions.   See Southworth, 529 U.S. at 235 ("The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views.").

123.   AB 2098 chills Plaintiffs' speech by subjecting them to discipline and negative professional consequences for conveying a certain message to their patients.   See Iancu, 138 S. Ct. at 2299 ("The government may not discriminate against speech based on the ideas or opinions it conveys.").

124.   AB 2098 also deprives Plaintiffs' patients, as well as patients like Dr. Khatibi, of their right to receive advice and hear treatment options unfettered by concerns about professional discipline.

125.   In sum, AB 2098 is facially unconstitutional.   It violates Plaintiffs' First Amendment rights to speak freely by imposing a viewpoint-based restriction upon their communications with their patients, and it violates their patients' First Amendments rights to hear their doctors' unvarnished opinions.

**COUNT II: FOURTEENTH AMENDMENT VIOLATION (UNCONSTITUTIONALLY VAGUE)**

126.   Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

127.   AB 2098 provides for the Board to take disciplinary action against physicians who disseminate "misinformation" and "disinformation" about Covid-19 in the context of treating patients.

128.   "Misinformation" is defined as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."

129.   The language of AB 2098 contains no definition of the term "scientific consensus,"

nor any guidance as to how this term could be defined.

130.    Plaintiffs have no way of determining the "scientific consensus."  Is it the position of health authorities, and if so, state, local, or federal?  Is it the position of a certain percentage of practicing doctors?  What percentage?  An absolute majority?  A mere plurality?  If a consensus is to be determined this way, how are Plaintiffs to know what the consensus stance is, given that there are not daily polls of all American (or California) physicians on every subject pertaining to Covid-19?  Even if such a poll could theoretically be taken, can all doctors and scientists participate, or only those in certain fields?  Or only those treating Covid-19 patients?

131.    Because the term "scientific consensus" is not clearly defined, and arguably impossible to determine, the law is open to arbitrary implementation by the Board, which includes many non-physicians.

132.    Likewise, the term "disinformation" is defined as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead."

133.    Because the term "misinformation" is unconstitutionally vague, the concept of "disinformation," which utilizes this term in its definition, is likewise unconstitutionally vague.

134.    The vagueness of both terms will have a chilling effect on physicians, because the imprecision of the language means that "rather than risk sanctions, citizens will steer far wider than necessary to avoid engaging in prohibited speech."  Hunt, 601 F.Supp.2d at 1170.

135.    Indeed, Plaintiffs have already attested that they now fear engaging in honest communications with their patients for fear of being reported and disciplined by the Board.

136.    AB 2098 is unconstitutionally vague, offending Plaintiffs' rights to due process of law, and must be voided.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the

following relief:

A declaration that AB 2098 violates Plaintiffs' rights under the First Amendment of the United States Constitution because it discriminates based on viewpoint and content;

A declaration that AB 2098 violates Plaintiffs' rights to due process of law under the Fourteenth Amendment to the United States Constitution due to its vagueness;

An injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), and each of them, from enforcing AB 2098;

Nominal damages of $1 for each Plaintiff;

Attorney's fees pursuant to 42 U.S.C. § 1988; and

Any other just and proper relief.

## **JURY DEMAND**

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

November 1, 2022

Respectfully submitted,

/s/ *Laura B. Powell*

Laura B. Powell (CA Bar No. 240853)
2120 Contra Costa Blvd #1046
Pleasant Hill, CA 94523
Telephone: (510) 457-1042
laura@laurabpowell.com
*Local Counsel*

/s/*Jenin Younes*

Jenin Younes* **
Litigation Counsel
(as authorized on November 1, 2022)

/s/*Gregory Dolin*

Gregory Dolin, MD*
Senior Litigation Counsel
(as authorized on November 1, 2022)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

25

NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
jenin.younes@ncla.legal

*Pro hac vice applications pending
** Admitted only in New York.  DC practice limited to matters and proceedings before United States courts and agencies. Practicing under members of the District of Columbia Bar.

*Attorneys for Plaintiffs*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF